Filed 10/12/22  P. v. Harmon CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARY JAY HARMON,<br><br>    Defendant and Appellant. | H047526<br>(Santa Clara County<br>Super. Ct. No. F1662391) |

Gary Jay Harmon challenges the sufficiency of evidence supporting his convictions for two counts of securities fraud (Corp. Code, § 25540), contending that the promissory notes on which these convictions were based do not, as a matter of law, qualify as securities.[1]  Harmon further contends that he is entitled to resentencing pursuant to Senate Bill No. 567 (Reg. Sess. 2021-2022), which went into effect on January 1, 2022.  We reject Harmon's challenge to the sufficiency of the evidence but conclude that Harmon is entitled to resentencing.  Accordingly, we reverse the judgment and remand for resentencing pursuant to Senate Bill No. 567.

---

[1] In addition to securities fraud, a jury convicted Harmon of two alternative counts of grand theft (Pen. Code, § 487, subd. (a)) arising from the same conduct and two further counts of grand theft arising from distinct but related conduct.  On appeal, Harmon does not contest the convictions for four counts of grand theft.

# I.   BACKGROUND

## A.   *The Information*

The People alleged seven counts in the operative Information: (1) felony grand theft (Pen. Code, § 487, subd. (a))[2] from Drew Perkins; (2) felony securities fraud (Corp. Code, § 25540) upon Mary McGreevy; (3) felony grand theft (§ 487, subd. (a)) from McGreevy; (4) felony securities fraud (Corp. Code, § 25540) upon Jesse Castillo; (5) felony grand theft (§ 487, subd. (a)) from Jesse Castillo; (6) felony grand theft (§ 487, subd. (a)) from Luck Films LLC; and (7) felony grand theft (§ 487, subd. (a)) from Mike DiRubio.

As to counts 1 through 5, the People alleged that the value of the property taken in connection with each count exceeded $65,000 (§ 12022.6, subd. (a)(1)). As to count 7, the People alleged that the value of the property taken exceeded $200,000 (§ 12022.6, subd. (a)(2)). The People further alleged that the felony crimes charged in counts 1 through 7 are related, that a material element of the crimes was fraud and embezzlement, and that Harmon's pattern of felony conduct resulted in his taking of more than $500,000 (§ 181.11, subd. (a)(1)-(2)).

## B.   *Trial Evidence[3]*

Harmon once worked at Ann Sobrato High School in Morgan Hill, but around 2010, he left the high school and formed the nonprofit Sobrato Arts Foundation for Education (SAFE). Harmon used the Sobrato family name to gain "instant credibility," but SAFE had no connection to the philanthropic family organization. Upon leaving employment at the high school, Harmon's full-time job was serving as SAFE's executive

---

[2] Undesignated statutory references are to the Penal Code.

[3] Because Harmon's appeal as to the sufficiency of the evidence relates solely to counts 2 and 4, we focus our overview of the evidence on Harmon's conduct relating to McGreevy and Castillo.

director. SAFE's website falsely identified Steve Wozniak and Willie Nelson as members of its board of directors. SAFE's website also identified "advisory board members"—including Nelson and Eddie Money—who were "advisory board members without knowing it."

Harmon also formed the for-profit entities ISE Entertainment (ISE) and Luck Films, LLC.[4] Harmon had recruited Kerry Wallum to work for him, offering him $10,000 per month and housing in Morgan Hill to pursue business opportunities together. Harmon falsely claimed that Wozniak was going "to put up $20,000,000[,]"[5] which Wallum understood would fund his salary, housing, and the business opportunities he and Harmon would pursue.

During 2012, Harmon involved both for-profit entities in an effort to develop a television series around former Mötley Crüe frontman Vince Neil (Vince Neil show[6]). Three days of footage at Neil's strip club and restaurant yielded a low-budget "sizzle reel," but the project did not progress beyond that point.

### 1. *McGreevy*

In the summer of 2012, at Steve Wozniak's birthday party, McGreevy met Harmon by introduction of Wallum, her friend. Harmon told McGreevy that he ran SAFE, a non-profit that paired high school students and industry experts in producing media.

---

[4] Although "Luck Films" originated as an informal production arrangement between Kerry Wallum and others, Harmon eventually formed the LLC in his name only.

[5] Wozniak testified that he did not recognize Harmon's name and denied having a plan or the ability to invest $20 million in ISE. Kenneth Hardesty, a personal friend of Wozniak's who helps him review business proposals, had "quite a few meetings" with Harmon in an effort to help Harmon form a business plan but was unable to "make sense of" Harmon's plan. Hardesty denied ever discussing Harmon's business plan with Wozniak.

[6] "[A] poker series with scantily clad women distracting men."

3

The next night, Wallum in turn asked McGreevy for "a short-term bridge loan" to get a $125,000 loan balance to Perkins "off the books" so that he and Harmon could complete a "fairly substantial" "deal."[7] Wallum repeated to McGreevy Harmon's claim that Wozniak and his associates were going to invest $20 million in ISE to pursue various projects.

Wallum arranged for Harmon to meet with McGreevy again. Harmon reiterated what Wallum had told her but embellished further, adding that the "thing happening with Woz," included a lucrative deal with Apple to put iJams—an app that Harmon had conceived that would be "like karaoke for musicians"—in the App Store, and that Wozniak had also asked Harmon to produce a new Us Music Festival, for which he "had already booked Sting." Harmon also spoke of the profit potential for "preshow media" for distribution to theaters "that would obviously generate profits later." But, Harmon said, for the investors to buy in and for these projects to go forward, ISE had to pay the outstanding loan balance to Perkins. Harmon further assured McGreevy that the Vince Neil show was "in the can"—which McGreevy understood to mean that the full series was complete—and being shopped to Netflix. McGreevy did not take a hard look at these projects, as she "was fairly trusting" and believed that Harmon was associated with the Sobrato family organizations, which she collectively viewed as "a gold star organization" that placed a "green check mark" on Harmon.

Harmon ultimately requested $140,000, although McGreevy could not recall why the sum increased from $125,000 to $140,000. McGreevy, using a combination of her own money and money that she persuaded her partner and his family to provide, agreed

_____

[7] Perkins, "a serial entrepreneur and executive in the tech industry," loaned Harmon $125,000—ostensibly for production of the Vince Neil sizzle reel—secured by "a lien and security interest in all of [Harmon's] present and future assets and properties." Harmon agreed to pay Perkins 10 percent interest per annum and 5 percent of the net proceeds derived from the Vince Neil Show. The $125,000 from Perkins far exceeded what Harmon allocated for production of the sizzle reel.

to loan Harmon and Wallum $140,000. McGreevy was mostly motivated by her desire to do Harmon and Wallum a favor—she had seen Wallum excited about "this thing building over months" and taking a lot of phone calls, and she wanted to see it "come to life." Despite the "trust-based" and "very casual" transaction, McGreevy also executed a promissory note that, as she understood it, would secure her a profit. The terms of the note provided that (1) Luck Films owed a $140,000 debt to McGreevy, due February 1, 2013 with 10 percent annual interest; (2) McGreevy received "5% of shares of the Vince Neil Poker Series[;]" and (3) McGreevy received a security interest in unidentified assets of Luck Films.

McGreevy would not have agreed to loan the money if she had not been promised prompt repayment, because she needed the money to cover taxes and her partner's down payment for the purchase of a restaurant already under contract. She could not have secured the full $140,000 in funding, including the amount provided by her partner, without the promise of a 10 percent interest rate. Further, the promise of 5 percent of shares of the Vince Neil show was material to McGreevy's efforts to persuade her partner to help fund the loan, because Harmon's representations led her to believe there was "a substantial potential for a substantial return." Harmon did not explain why Luck Films was involved in the transaction and did not provide McGreevy any information about any Luck Films assets. He did tell McGreevy that Luck Films was his partnership with Willie Nelson and Wallum.

McGreevy did not receive repayment by the note's maturity date. Harmon attributed the delay in repayment to the fact that the ISE deal with Wozniak "was still in process" and that they had just acquired Boulder Creek Guitars and a warehouse. McGreevy had expected her money to be used to pay down a debt, not to acquire a company—"this other thing was supposed to be happening, and instead this thing happened."

In the end, the ISE deal with Wozniak never materialized and McGreevy secured a return of only $20,000 of her $140,000 stake.[8]

### 3.  *Jesse Castillo*

Jesse and Roni Jo Castillo owned and operated a small winery in Morgan Hill, which Harmon visited in August or September of 2012.  Harmon described his work at SAFE and spoke of hosting SAFE events at the winery.  Seeing the Castillos' daughter with her guitar, Harmon let the Castillos' daughter play a guitar he claimed another of his ventures, Boulder Creek Guitar Company, had just built for Willie Nelson.  Harmon told the Castillos that Nelson was going to invest in Boulder Creek Guitars and endorse and promote the guitars.  Harmon gave the impression that he had a personal relationship to Wozniak and said he could arrange for the Castillos' daughter to open for Creedence Clearwater Revival at a concert that fall.  The Castillos visited the SAFE website and saw that Nelson and Wozniak were identified as board members or partners.

In the following months, Harmon regularly visited the winery and talked to the Castillos' son and daughter about producing CD's featuring their music.  In short order, the Castillos viewed Harmon as a connected individual who could open doors for their children to pursue careers in music.

In December 2012, contrary to his prior representation that he owned Boulder Creek Guitar Company, Harmon told the Castillos that he and Wallum had paid a substantial amount toward the purchase and needed $150,000 more to wrap it up.  Harmon said that he would be able to repay the amount in short order because he would be getting $10 million from Wozniak in March to produce an upcoming Us Music

---

[8] The $20,000 came from DiRubio, a participant in Harmon's SAFE activity and eventual "investor" in Harmon's schemes.  In return for a promised 50 percent partnership with Harmon, including half of all of the ISE assets, DiRubio in early 2013 invested approximately $250,000 of a worker's compensation award he received for a catastrophic spinal injury.  Other than the $20,000 payment to McGreevy, Harmon used most of the money for his personal expenses.

Festival. Harmon projected huge profits in the next two years. Skeptical, Roni Jo Castillo opposed the proposed transaction, but Jesse Castillo agreed to it.

Jesse Castillo negotiated the language of a promissory note with Harmon across multiple drafts. The promissory note provided that (1) Luck Films owed a $125,000[9] debt to Jesse Castillo, with annual interest of 10 percent, due and payable on June 1, 2013; (2) Luck Films was to deliver Jesse Castillo stock certificates for 15 percent of the total shares of "Boulder Music Group LLC"; (3) Jesse Castillo received a security interest in Luck Films's assets; and (4) Jesse Castillo could declare the outstanding principal and interest immediately due and payable if Luck Films failed to complete the purchase of "Boulder Creek Guitar" assets, failed to complete the purchase of the building located at 375 Digital Drive in Morgan Hill, or defaulted on any obligation of the purchases.

Jesse Castillo's primary reason for agreeing to the transaction was to ingratiate himself to Harmon, who he believed could make his children famous. Even so, Jesse Castillo would not have agreed to the transaction if Harmon had not promised to return the money by June 1, 2013 and to give him a 15 percent share of the guitar company. Indeed, Jesse Castillo had spoken to an employee and left with the impression that the guitar company was going to be very profitable. Jesse Castillo did not discuss Luck Film's assets or financial stability with Harmon, although he believed it to be Harmon's company. Rather, Jesse Castillo understood that repayment would come from Wozniak's forthcoming $10 million payment to Harmon in connection with the Us Music Festival, which Castillo believed was very likely to occur.

At the end of January 2013, Harmon, through Luck Films, closed on an agreement to purchase the assets of Morgan Hill Music, the company that sold Boulder Creek Guitars as a product line, from Randall Medina. Pursuant to the terms of the agreement,

---

[9] Castillo was only able to come up with $125,000.

7

the $1.3 million purchase price was to be paid over three years, with only $50,000 due at closing. Harmon made the initial $50,000 payment about two weeks late, and never made any other payments toward the $1.3 million. After taking control, Harmon cut costs and arranged for incoming company revenues to be sent to an account of his choosing.

In around April 2013, Jesse Castillo confronted Harmon and Wallum in an attempt to find out where the money he had given Luck Films had gone. Harmon refused to answer, prompting Wallum to lose his temper.

Harmon did not repay Jesse Castillo the $125,000 or supply certificates evidencing Castillo's 15 percent ownership of the guitar company. By June 1, 2013, "everything had kind of fallen apart and [Jesse Castillo] pretty much didn't want nothing to do with Gary Harmon." Accordingly, Jesse Castillo did not, after June 1, 2013, contact Harmon to ask why he was not being repaid.

## C.    *Verdict and Sentencing*

The jury convicted Harmon on all counts except count 6, the alleged grand theft from Luck Films LLC. As to counts 2 through 5, involving McGreevy and Jesse Castillo, the jury found true the special allegation that Harmon took over $65,000.[10] As to count 7, involving DiRubio, the jury found the allegation that Harmon took over $200,000 true. As to at least two of the counts on which it convicted Harmon, the jury found that the crimes were related, a material element of the crimes was fraud or embezzlement, the crimes involved a related pattern of felony conduct, and the pattern of related felony conduct involved the taking of more than $500,000.

The trial court initially sentenced Harmon to 12 years 4 months in prison: (1) an upper-term five-year sentence for count 2, plus a one-year enhancement pursuant to section 12022.6; (2) a one-year sentence on count 4, reflecting one-third of the mid-term

___

[10] The jury rejected the same allegation as to Perkins.

sentence, plus a four-month enhancement pursuant to section 12022.6; (3) eight-month sentences on counts 1 and 7, reflecting one-third of the mid-term sentence, plus an eight-month enhancement on count 7 pursuant to section 12022.6; and (4) a three-year enhancement pursuant to section 186.11, subdivision (a)(2), all to be served consecutively.[11]

The trial court subsequently recalled Harmon's sentence and dismissed each of the section 12022.6 enhancements under section 1385, given the repeal of section 12022.6 and its uncertainty whether section 12022.6 could nonetheless still apply to enhance the sentence for a pre-repeal offense. Accordingly, the trial court resentenced Harmon to 10 years 4 months, with 585 days of credit for time served.

The trial court ordered Harmon to pay a combined total of over $700,000 in victim restitution, plus interest. The trial court ordered Harmon to pay $500,000 in additional restitution pursuant to section 186.11, subdivision (c).

Harmon timely appealed.

## II. DISCUSSION

### A. *Sufficiency of the Evidence Regarding Securities Fraud*

Harmon contends that his convictions for two counts of securities fraud should be reversed because the promissory notes he used to induce McGreevy and Jesse Castillo to send him money were not securities. To the contrary, we conclude that there is sufficient evidence to support the finding that both promissory notes were securities.

#### 1. *Standard of Review*

A criminal conviction must be supported by sufficient evidence. "[T]he question we ask is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) "We

---

[11] The trial court stayed three-year sentences on counts 3 and 5, which constituted mid-term sentences with one-year enhancements, pursuant to section 654.

review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably might justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]"  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

### 2.     *Legal Principles*

Enacted as part of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), sections 25401 and 25540 of the Corporations Code " 'criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts . . . .' [Citation.]" (*People v. Black* (2017) 8 Cal.App.5th 889, 899 (*Black*), fn. omitted.)  Corporations Code section 25019 defines " 'security' " using an " 'expansive' " list of "transactions and instruments deemed to be securities"—including "any note" or " 'investment contract' "—but the list "is not applied literally."  (*Black*, *supra*, at pp. 899-900.)  We look instead to "whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition.' "  (*Id*. at p. 900.) " ' "[T]he general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon." ' "  (*Id.* at p. 899.)

Whether a promissory note constitutes a security "presents a mixed question of law and fact:  ' "The definition of a security is a matter of law.  It is the judge's duty to instruct the jury concerning that definition: the way in which a security is identified.

10

Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case." ' " (*Black*, *supra*, 8 Cal.App.5th at p. 899.)

Of the two alternative tests California courts have used in evaluating an alleged security, we focus on the *Howey* test, the basis for the trial court's instruction to the jury. (See *Black*, *supra*, 8 Cal.App.5th at p. 900; *S.E.C. v. W.J. Howey Co.* (1946) 328 U.S. 293 (*Howey*).)[12] The *Howey* test turns on whether a particular vehicle is an "investment contract." (See *Howey*, *supra*, at pp. 298-301; *People v. Smith* (1989) 215 Cal.App.3d 230, 235-238 (*Smith*) [rejecting claim of instructional error where trial court instructed the jury that the term "security" includes an "investment contract" and provided the elements of an "investment contract"]; Corp. Code, § 25019 [definition of "security" includes "investment contract"].)[13]

---

[12] The trial court instructed the jury: "A financial transaction or relationship is a security if all of the following elements are present: [¶] 1. A person entrusted money or other capital to another; [¶] 2. The person who entrusted the money or capital to another did so with the expectation of receiving a profit, income, or some financial benefit from a common enterprise; AND, [¶] 3. The failure or success of the common enterprise was dependent on the managerial efforts of persons other than the person who entrusted the money or other capital. [¶] In determining whether a financial transaction or relationship is a security you should look through the mere form to the substance of the financial transaction or relationship. You should consider all evidence of the facts surrounding the financial transaction or relationship to ascertain the true intent of the parties, their mutual expectations, and the rights and interests acquired by the person who entrusted the money or capital to another. The mere name given to an instrument or interest is not dispositive." Harmon on appeal does not contest the propriety or adequacy of the jury instruction.

[13] Unlike the *Howey* test, the risk capital test requires, among other elements, " ' "an indiscriminate offering to the public at large where the persons solicited are selected at random" ' "—an element that is not satisfied in this case. (See *Black*, *supra*, 8 Cal.App.5th at p. 900, quoting *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815.) Although *Black* refers to *Howey* as "the federal" test, federal courts have shifted to using the "family resemblance test" to assess whether a "note" is a security under federal law, no party advocated for the adoption of that test in this case. (See *Reves v. Ernst & Young* (1990) 494 U.S. 56, 64-67 (*Reves*) [rejecting *Howey* test in favor

11

Specifically, we look to " 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'  A common enterprise 'may be established by showing "that the fortunes of the investors are linked with those of the promoters," ' such as by a profit-sharing arrangement. [Citation.]  An expectation of profits produced by the efforts of others exists 'when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " ' " (*Black*, *supra*, 8 Cal.App.5th at p. 900; see also *Smith*, *supra*, 215 Cal.App.3d at p. 236.) The *Howey* test is a " 'flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits.' " (*Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 335.)

3. ***Whether Sufficient Evidence Supports a Finding that the Promissory Notes Were Securities***

The McGreevy promissory note provided that Luck Films owed a $140,000 debt to McGreevy, subject to a 10 percent per annum interest rate.  Pursuant to the note: (1) McGreevy was required to wire $140,000 to Luck Films; (2) the principal and accrued interest were due and payable on February 1, 2013, about three months from execution; (3) McGreevy received "5% of shares of the Vince Neil Poker Series[;]" and (4) McGreevy received a security interest in Luck Films's assets.

The Castillo promissory note provided that Luck Films owed a $125,000 debt to Jesse Castillo, subject to a 10 percent per annum interest rate.  Pursuant to the note:

---

of the family resemblance test as a means for determining whether a "note" not constituting an "investment contract" is nonetheless a security]; see also *Thompson v. People* (Colo. 2020) 471 P.3d 1045, 1051-1057, 1059 [following *Reves* and identifying a "clear trend among state courts around the country . . . to adopt the family resemblance test for determining whether a note is a security for the purposes of their state securities acts"].)

(1) Jesse Castillo was required to wire $125,000 to Luck Films; (2) the principal and accrued interest were due and payable on June 1, 2013, about five-and-a-half months from execution; (3) Luck Films was to deliver Jesse Castillo stock certificates for 15 percent of the total shares of Boulder Music Group LLC; (4) Jesse Castillo received a security interest in Luck Films's assets; and (5) Jesse Castillo could declare the outstanding principal and interest immediately due and payable if Luck Films failed to complete the purchase of Boulder Creek Guitar assets, failed to complete the purchase of the building located at 375 Digital Drive in Morgan Hill, or defaulted on any obligation of the purchases.

Applying the *Howey* test, the evidence adduced at trial is sufficient to support the finding that both promissory notes were investment contracts covered by the securities laws. The jury could determine that each element of the *Howey* test was satisfied and that the general purpose of the law to protect the public from insubstantial and fraudulent investment schemes was implicated by Harmon's conduct.

### a.     *Expectation of Profits*

Harmon argues that McGreevy and Jesse Castillo both entrusted him with their money for reasons other than an expectation of profit. But the record supports a finding that both McGreevy and Jesse Castillo expected to secure a profit pursuant to the terms of the transactions, including both a prompt fixed profit through repayment plus interest via the Wozniak investment and variable profits based on their percentage shares in specified ventures.

" '[P]rofits,' " for the purposes of the *Howey* test, are " 'financial returns on . . . investments." (*S.E.C. v. Edwards* (2004) 540 U.S. 389, 396.) This broad construction is consistent with "Congress' intent to regulate all of the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' " (*Ibid.*) Thus, an investment scheme promising a fixed rate of return can be an " 'investment contract' " and thus a "security," under the *Howey* test. (*Id*. at p. 397.) The

13

relevant profits are those that the investors seek to secure on their investment, not the profits of the scheme in which they invest. (*Ibid*.) Both McGreevy and Jesse Castillo testified that they would not have accepted the promissory note without the promise of a personal profit.

While Harmon calls attention to McGreevy's testimony that she wanted to do Harmon and Wallum a "favor," the coexistence of nonpecuniary motivations for giving Harmon the use of their money does not preclude a jury finding that both McGreevy and Castillo invested money with the expectation of a profit. McGreevy plainly testified that she would not have made the transaction without the expectation of a profit: her partner would not have agreed to the transaction without the 10 percent interest rate on the principal and the promise of 5 percent of Vince Neil show shares, and the expectation of "a substantial potential for a substantial return" thereon, was "important" to secure his agreement to invest.

Similarly, although Jesse Castillo attempted to curry favor by doing business with Harmon, in the hope that his association with Harmon would further his children's musical careers, he testified that he would not have accepted the note without Harmon's promise to return the money by June 1, 2013 and give him a 15 percent share in the guitar company.

### b.     *Common Enterprise*

Harmon contends that the promissory notes are not securities because McGreevy and Jesse Castillo both had an unconditional right to full repayment,[14] plus interest, rather than an expectation of profits from a common enterprise. We conclude, to the contrary, that the record permits a finding that McGreevy and Jesse Castillo—in their expectation

---

[14] There is no dispute that both McGreevy and Jesse Castillo paid money pursuant to the promissory notes.

14

of profit—tied their fortunes to Harmon's ostensible ventures by investing in his fledgling business enterprises.

### i.  *Direct correlation between Harmon's success or failure and the potential profit or loss*

Commonality of an enterprise, under *Howey*, may be established by "an arrangement to share profits on a percentage basis between the investor and the seller or promotor.  [Citation.]"  (*S.E.C. v. R.G. Reynolds Enters., Inc.* (9th Cir. 1991) 952 F.2d 1125, 1130 (*R.G. Reynolds*); see also *Black*, *supra*, 8 Cal.App.5th at p. 900 [quoting *R.G. Reynolds*].)  A "direct correlation" between the seller or promoter's "potential failure and the investors' losses supports a finding of a common enterprise."  (*S.E.C. v. Goldfield Deep Mines Co. of Nevada* (9th Cir. 1985) 758 F.2d 459, 463 (*Goldfield*); see also *Moreland v. Department of Corporations* (1987) 194 Cal.App.3d 506, 514-515 (*Moreland*) [quoting *Goldfield*]; *R.G. Reynolds*, *supra*, 952 F.2d at p. 1134.)

The record supports the jury's finding that McGreevy and Castillo each invested in a common enterprise.  As to McGreevey, (1) the return of her principal plus the payment of interest depended, consistent with Harmon's representations, on Harmon's success in securing additional investors to support his nascent iJams product and Us Films Festival production, the ostensible purpose for which Harmon needed McGreevy's money; and (2) any proportional share of the profits from the Vince Neil show depended on Harmon's success in producing and selling the show.  Likewise as to Castillo, (1) the return of his principal plus the payment of interest depended, in Harmon's telling, on Harmon's success in producing the Us Films Festival; and (2) the value of any stock in Boulder Music Group LLC depended on Harmon's success in managing the company.  There was a direct correlation between Harmon's success or failure in those regards and the profit or loss to McGreevy and Castillo alike.[15]  Based on Harmon's representations,

---

[15] Harmon contends that Jesse Castillo's belief that he would receive full repayment "regardless of the company's success or failure" precludes a finding that Jesse

15

both McGreevy and Jesse Castillo understood that, as a practical matter, repayment, and profit, depended on Harmon securing new capital, rather than adequate collateral. As a result, their right to repayment and the potential for profit depended on the early success of Harmon's business ventures.

Harmon's characterization of the investments as "bridge loan[s]" does not foreclose a jury finding of a common enterprise. Harmon cites no authority for his premise that a bridge loan cannot be a security under the *Howey* test and does nothing to distinguish counterexamples. (See *Securities Exchange Commission v. Moss* (E.D. Tex. Mar. 11, 2022) 2022 WL 757226, at *4 [holding that "partnership" and "bridge loan" interests were securities under the *Howey* test on a motion for default judgment]; *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 234, 236-239, 255-256 [treating "bridge notes," which investors understood would be paid off with the proceeds of a preferred stock offering, as securities].)[16] Indeed, we must focus on the

---

Castillo was invested in a common enterprise. But the record includes Jesse Castillo's testimony that he believed he would be repaid from the income Harmon received from Wozniak in connection with the Us Music Festival and did not know how Harmon could repay him without success in that endeavor. Harmon offers no meaningful explanation why this testimony is insufficient.

[16] Even among federal courts applying the family resemblance test, whether bridge notes have been deemed securities has been a case-specific inquiry dependent upon particular facts. (Compare *Bass v. Janney Montgomery Scott, Inc.* (6th Cir. 2000) 210 F.3d 577, 585 [stating that "the reasonable expectation of the investing public would be that bridge loans are not securities" in affirming determination that promissory notes were not securities under family resemblance test]; with *Callais Capital Management, LLC v. Wilhite* (E.D. La. Mar. 31, 2021) 2021 WL 1216526, at *7 [quoting *Bass*, but distinguishing it where the agreements were "drafted with various terms (and a very high interest rate) that suggests that the instruments are not typical bridge loans"]; *Fox v. Dream Trust* (D.N.J. 2010) 743 F.Supp.2d 389, 397-401 [in dictum, concluding that a " 'bridge loan' " that was not transacted between sophisticated commercial entities, involved substantial new investments rather than current operations, and involved a loan participant who had a pre-existing investment interest in the subject matter of the loan was a security under the family resemblance test].) Under the family resemblance test, any "note" is presumed to be a security, but that presumption may be rebutted by a

substance of the transaction, not the label. (*People v. Figueroa* (1986) 41 Cal.3d 714, 737, fn. 28 (*Figueroa*); see also *Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 610.) However labeled, McGreevey and Jesse Castillo invested their money in a common enterprise because they tied their fortunes to the success or failure of Harmon's business ventures.

### ii.      *Inadequacy of security against risk*

Contending that the instruments here are not securities because McGreevy and Jesse Castillo had a contractual right to repayment, Harmon argues that this case is analogous to *Black*, in which Charles Baxter Black persuaded Bronic Knarr to invest in a real estate development in Idaho in exchange for a promissory note providing Knarr a security interest in Black's personal property. (*Black, supra*, 8 Cal.App.5th at p. 892.) The Black note provided that the development company would reimburse Knarr for his investment, plus either interest on that sum or property rights, depending on conditions subsequent. (*Id.* at pp. 892-893.) In affirming the dismissal of securities fraud charges, the reviewing court acknowledged that the notes "display[ed] certain essential characteristics of an 'investment contract' under the *Howey* test, particularly given the undisputed evidence that Knarr agreed to put his money toward the proposed Idaho land

---

showing that the note bears a strong "resemblance" to a "family" of notes that has been deemed not a security. (*Reves, supra*, 494 U.S. at pp. 65-67.) In assessing whether a family resemblance exists, courts consider four factors: (1) The motivations that would prompt a reasonable buyer and seller to enter the transaction; (2) Whether, considering the plan of distribution, the instrument is one in which there is common trading for speculation or investment; (3) Whether the investing public reasonably expects that the instrument is a security; and (4) Whether some factor, such as the existence of a separate regulatory scheme, substantially reduces the risk of the instrument making the application of the securities law unnecessary. (*Id.* at pp. 66-67; see also *Stoiber v. S.E.C.* (D.C. Cir. 1998) 161 F.3d 745, 751 (*Stoiber*) [the third factor allows an instrument that the public reasonably expects to be treated as a security to be treated as such even where the other factors are not satisfied, but does not allow a security to evade regulation where the other factors are satisfied]; *S.E.C. v. Thompson* (10th Cir. 2013) 732 F.3d 1161, 1168 [citing *Stoiber* with approval].)

17

deal and was led by Black to expect substantial profits as a result of Black's efforts." (*Id*. at p. 902.) But the court found this to be outweighed by the individual negotiation of the investment contract, in an arrangement that could not have been traded publicly or offered widely, and a repayment option independent of the success of the enterprise, because the note was secured by an interest in Black's personal property. (*Id*. at pp. 902-909.)

Although the court did not assign any one factor dispositive weight, it concluded that the pledge of Black's personal property as adequate collateral distinguished the case before it from *People v. Park* (1978) 87 Cal.App.3d 550 (*Park*). (*Black*, *supra*, 8 Cal.App.5th at pp. 908-909.) In *Park*, Park secured $40,000 in real estate investments from two investors in exchange for the first $55,000 of profits to be realized from the sale of the completed project. (*Park*, *supra*, 87 Cal.App.3d at pp. 557-558.) The *Park* court held that the transaction "f[e]ll[] squarely within [the *Howey* court's] definition of investment contract. . . . [T]he transaction involved an investment of funds in [Park]'s alleged land development and condominium project to be built in the future; . . . the profit to be realized from the investment was expected solely from [Park]'s efforts; . . . the investors had no control over the management of the enterprise and had no power whatsoever to affect the fortune of the project; and . . . the success of the enterprise depended solely on the honesty and managerial skill of [Park]." (*Id*. at p. 563.) In distinguishing *Park*, the *Black* court reasoned that " '[t]he return on any investment which has *not* been secured with adequate collateral depends on the success of the business. This is true whether the investment contemplates a percentage of the profits or a fixed return.' " (*Black*, *supra*, 8 Cal.App.5th at p. 906, italics added, quoting *Figueroa*, *supra*, 41 Cal.3d at p. 738.)

The distinction *Black* drew from *Park*, in turn, distinguishes *Black* from the present case. Although McGreevy and Jesse Castillo had a nominal right to full repayment with interest irrespective of the success of the venture, the record is sufficient

18

to establish that this right was inadequately secured. Neither promissory note was secured by an interest in Harmon's personal assets. Moreover, neither McGreevy nor Jesse Castillo made any attempt to ensure that their promissory notes were adequately secured—the record provided ample support for the finding that they were not. Thus, here, unlike in *Black*, the return on McGreevy and Jesse Castillo's investments turned on the success of Harmon's business enterprises. (See *Figueroa*, *supra*, 41 Cal.3d at pp. 738-739.)[17]

In the alternative, Harmon contends that there was insufficient evidence that Luck Films lacked the wherewithal to provide collateral for McGreevy's and/or Jesse Castillo's loan. We disagree. The undisputed evidence reflected that Harmon created Luck Films in his name only, and Harmon concedes that until he received McGreevy's contribution, Luck Film's bank account had a balance of $4.46, ISE's bank account had a balance of $898.04, Harmon's personal bank account had a balance of $160.56, and Harmon's credit card was carrying a balance of almost $11,000. The evidence further reflected that Harmon failed to pay the $125,000 debt to Perkins until he received McGreevy's stake, failed to pay Luck Films's debt to McGreevy before accepting money from Jesse Castillo, and used the funds obtained from his victims to pay his personal expenses— leaving himself saddled with increasing debts. Indeed, although McGreevy filed suit against, among others, Luck Films, Harmon admits that she has received repayment of

---

[17] Under Corporations Code section 25100, subdivision (p), the Legislature has exempted "[a] promissory note secured by a lien on real property, which is neither one of a series of notes of equal priority secured by interests in the same real property nor a note in which beneficial interests are sold to more than one person or entity" from specified provisions of the Corporate Securities Law. The logical corollary of this narrow exemption is that a secured transaction involving a series of promissory notes on the same property is intended to be governed by the Corporate Securities Law. (See *People v. Schock* (1984) 152 Cal.App.3d 379, 390.) This is consistent with the distinction we draw between *Black*, where the adequacy of the collateral cut against the finding that the instrument was a security, and the present case, where the inadequacy of the collateral supports a finding that the instruments were securities.

19

only $20,000, from DiRubio's spinal injury compensation. There was ample evidence that the pledge of Luck Films's assets as collateral was virtually, if not entirely, worthless.

### c. *Success or Failure Determined by the Entrepreneurial or Managerial Efforts of Others*

Harmon contends that Jesse Castillo cannot meet the third element because he was involved in the management of Boulder Creek Guitars. But the record supports a finding that both McGreevy and Jesse Castillo were depending on the entrepreneurial and managerial efforts of others. McGreevy had no role, aside from her infusion of capital, in Harmon's efforts to secure investors for his nascent enterprises or to produce and sell the Vince Neil show. Similarly, Jesse Castillo had no role in Harmon's efforts to produce an Us Music Festival.

On the record presented, the jury could also find that Jesse Castillo exercised no control over the failure or success of the guitar company. At the time of the transaction, Jesse Castillo was merely giving Harmon money, he was to have no role in the management or operation of the company. However, after the transaction was consummated, Wallum and the company manager decided that "there were discrepancies in the books," such that Harmon could no longer be trusted with access to the company's checking account, and secured Jesse Castillo's agreement to sign off on checks. Jesse Castillo allowed that he may have signed one check for the business, but testified that "there was no money in the account so there's no reason to sign anything." Given Jesse Castillo's limited and belated involvement, even assuming it is appropriate to consider events that transpired after the transaction was consummated, the jury could readily conclude that Castillo's "honesty and managerial skill," or lack thereof, could have no impact on the "success of the enterprise." (See *Black*, *supra*, 8 Cal.App.5th at pp. 908-909.) Simply, access to withdraw funds from an empty, or substantially empty, business

20

checking account does not establish, as a matter of law, control over the success or failure of a business.

### d. *General Purpose of the Securities Laws*

Relying on *Black* and *Marine Bank v. Weaver* (1982) 455 U.S. 551 (*Marine Bank*), Harmon argues that the promissory notes in this case are beyond the regulatory purpose of the securities law because they were idiosyncratic individually negotiated transactions. But *Black* did not hold that individual negotiations categorically preclude the application of the securities laws; the court relied on the confluence of individual negotiations and adequate collateral in a fact-specific determination that the protection of the securities laws was unnecessary. (*Black*, *supra*, 8 Cal.App.5th at p. 909.) Similarly, in *Marine Bank*, *supra*, 455 U.S. 551 the United States Supreme Court explained that "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." (*Id*. at p. 560, fn. 11.) *Marine Bank* does not stand for a broad rule precluding any one-on-one transaction from qualifying as a security. As the *Black* court explained, in *Park*, a California Court of Appeal applied the securities law where there were only two investors. (*Black*, *supra*, 8 Cal.App.5th at pp. 908-909.) Harmon's argument in essence would graft onto the *Howey* test the risk capital test's requirement of an " ' "indiscriminate offering to the public at large." ' " (*Black*, *supra*, 8 Cal.App.5th at p. 900.)

While there is some evidence of negotiation, particularly by Jesse Castillo, in this case, the record reflects that the negotiations were limited in scope and did not extend to the adequacy of the collateral underpinning the transaction. Moreover, the promissory notes here, while unconventional, do not reflect the carefully crafted exchange of consideration present in *Marine Bank*. Rather, Harmon dangled a too-good-to-be-true investment scheme to two members of the public who happened across his path, and they took the offer on Harmon's material terms.

While the promissory notes at issue here are unique, they fall within the general purposes of the securities law. (See, generally, *Black*, *supra*, 8 Cal.App.5th at p. 899 [general purpose of the law is to protect the public against the imposition of insubstantial, unlawful, and fraudulent stock and investment schemes and the securities based thereon].) McGreevey and Jesse Castillo provided Harmon with money to secure investors and assets for the nascent and multifaceted business enterprise he described to them. In return for their investments, Harmon promised McGreevey and Jesse Castillo a profit—both a fixed return on their money (from his advertised success in attracting capital) and a percentage share of specified ventures. Because they lacked any other basis for anticipating even the return of principal, McGreevey and Jesse Castillo "depended solely on [Harmon's] expertise, skill and honesty" for "the profit on their investments." (See *People v. Coster* (1984) 151 Cal.App.3d 1188, 1194; see also *Figueroa*, *supra*, 41 Cal.3d at p. 738 [citing *Coster* with approval].) As a result, McGreevey and Jesse Castillo lost all, or virtually all, of the money they entrusted to him.

**B.** ***Imposition of the Upper-Term Sentence on Count 2***

Effective January 1, 2022, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170 to make the middle term the presumptive sentence. (§ 1170, subd. (b)(1).) Moreover, section 1170, subdivision (b)(2) states in pertinent part: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at a trial by the jury or by the judge in a court trial." As Harmon's case was not yet final when these amendments to section 1170 took effect, he is entitled to retroactive application of the ameliorative change in the law, because nothing in Senate Bill No. 567 indicates that the Legislature intended the change to apply only prospectively. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *In re Estrada* (1965) 63 Cal.2d 740.)

22

Here, the trial court sentenced Harmon to the aggravated term for securities fraud as to McGreevy, citing Harmon's abuse of his position of trust, his multiple victims, the planning and sophistication of the offenses, and the two-year duration of his criminal conduct. The court identified Harmon's lack of prior criminal history as a mitigating factor. Upon recall of the sentence to strike the enhancements under section 12022.6, the trial court further described Harmon's criminal conduct as escalating, despite multiple opportunities to stop his fraud. The trial court indicated that it might have further reduced Harmon's sentence, if Harmon had paid restitution to his victims rather than "continu[ing] to spend his time blaming the victims and refusing accountability." Not all of the factors on which the trial court relied were found true by the jury or stipulated to by Harmon.[18] Accordingly, the trial court's sentencing decision relies on impermissible factors under section 1170, as amended. Because we are unable to conclude that the consideration of improper factors was harmless, we will remand the matter for resentencing.

### 1. *Prejudice*

#### a. *Legal Principles*

Since the amendments wrought by Senate Bill No. 567 went into effect, a handful of published decisions have addressed the framework for evaluating harmless error arguments in retroactively applying the statutes.

In *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), the first decision addressing the issue deemed remand was unnecessary on the record before it: " '[i]f a

---

[18] For example, the jury's verdict did not specify the dates on which the offenses occurred. The first offense in time, grand theft as to Perkins, occurred in or after July 2012, when Harmon embezzled the money Perkins loaned him. The last offense in time, grand theft by embezzlement as to DiRubio, occurred within six months of DiRubio's deposit in March 2013, when Harmon had depleted the funds. Thus, we cannot infer from the jury's verdict an implicit finding that Harmon's criminal conduct extended over a two-year period.

reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Id.* at p. 500.)

Subsequently, in *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), a court adopted a two-step approach to evaluating prejudice. At the first step, the court, applying the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), decides whether "to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury[.]" (*Lopez*, *supra*, 78 Cal.App.5th at pp. 465-466.) If so, then the error is not prejudicial. (*Ibid*.) If not, then the analysis proceeds to the second step. At the second step, "the reviewing court decides whether it can be certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836[ (*Watson*),] that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only" those aggravating factors that it could permissible consider, "rather than all of the factors on which it previously relied." (*Id*. at p. 467, fn. 11.) If not, "then it is clear that remand to the trial court for resentencing is necessary." (*Ibid*.)

Most post-*Lopez* published decisions have adopted some version of *Lopez*'s two-step inquiry. (See *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942 (*Wandrey*); *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1111-1112 (*Zabelle*); *People v. Dunn* (2022) 81 Cal.App.5th 394, 409-410 (*Dunn*); but see *People v. Salazar* (2022) 80 Cal.App.5th 453, 464-465; *People v. Flowers* (2022) 81 Cal.App.5th 680, 685-686 [concluding that record " 'clearly indicate[s]' " that trial court would not impose a more favorable sentence upon theoretical reversal for resentencing

24

because several of the factors relied on by the trial court were properly before it and the trial court found no mitigating circumstances].)

*Flores*, *Lopez*, *Wandrey*, *Zabelle*, and *Dunn* are all consistent in that they require at least one aggravating factor that the trial court actually relied upon to withstand *Chapman* scrutiny. Here, we readily conclude that at least one aggravating factor that the trial court actually relied on would without question have been found by the jury—the trial court relied on the existence of multiple victims and the jury convicted Harmon of six counts of securities fraud and grand theft for offenses against four victims.

We agree with *Lopez* and subsequent cases holding that reviewing courts must consider (1) whether the jury would have found the specified aggravating circumstances; and (2) whether, based on the specific aggravating circumstances that were properly considered, the trial court would have reached the same sentencing determination. (See *Lopez*, *supra*, 78 Cal.App.5th at pp. 465-468; *Wandrey*, *supra*, 80 Cal.App.5th at p. 982; *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1113; *Dunn*, *supra*, 81 Cal.App.5th at pp. 409-410.)

There is some tension in the published authority as to whether *Chapman* or *Watson* governs the inventory of additional aggravating circumstances that may be considered in step two of the analysis. In *Dunn*, the court held that the *Chapman* standard is satisfied if any aggravating factor withstands *Chapman* scrutiny. (*Dunn*, *supra*, 81 Cal.App.5th at p. 409.) If so, then the remaining aggravating circumstances are evaluated using *Watson* scrutiny. (*Ibid*.) The court then considers whether, in light of all aggravating factors that have survived the foregoing analysis, there is a reasonable probability that the trial court would have imposed a sentence other than the upper term. (*Id*. at pp. 409-410; see also *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1113.) *Lopez* suggests, to the contrary, that *Chapman* review should be applied to each aggravating circumstance found by the trial court. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11 [suggesting that the only aggravating factors that are relevant to the harmless error

25

analysis are those that withstand *Chapman* scrutiny]; see also *Wandrey*, *supra*, 80 Cal.App.5th at pp. 981-982 [citing *Sandoval* for the proposition that "[e]rror in relying on facts not found by the jury to impose an aggravated term is subject to review under [*Chapman*]"].)  We need not address that tension here because even under the more lenient level of scrutiny—assuming, under *Dunn* and *Zabelle*, that the *Chapman* review is complete upon the identification of one aggravating factor that withstands scrutiny, such that the balance of the analysis is carried out using the *Watson* standard—we would remand the matter for resentencing.

### b. *Watson*

Consistent with the foregoing discussion, the balance of the harmless error analysis requires us to consider (1) whether there is a reasonable probability that the jury would have found any aggravating circumstances true beyond a reasonable doubt and (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in step one.  (See *Dunn*, 81 Cal.App.5th at pp. 409-410.)[19]

In the present case, we find it appropriate to take those steps out of order.  At both sentencing hearings, the trial court's comments placed significant weight on the finding that Harmon "grave[ly]" abused an "extreme" position of trust as a "friend[]," "co-worker," and/or "colleague" for "all of the victims."  On the record before us,[20] we

_____

[19] Having bifurcated the *Chapman* and *Watson* analyses, we need not include the first sub-step articulated in *Dunn*.  Of course, each aggravating factor that withstood *Chapman* scrutiny—in this case we have addressed only the existence of multiple victims—will also withstand *Watson* scrutiny.

[20] We acknowledge that the trial court made other findings regarding the temporal duration of Harmon's criminal conduct, the number of victims, Harmon's planning sophistication, and the escalation in the offenses.  But we also recognize that the trial court applied consecutive sentences because of the number of victims and a sentencing enhancement because Harmon stole over $500,000.  The trial court indicated that it was attempting to tailor the punishment in the interest of justice, punishing Harmon for the aggravating factors without unduly punishing him given the enhancements already

26

conclude that there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in the absence of its findings regarding Harmon's abuse of his victims' trust.

Moreover, because the inherent nature of the offenses involves some level of abuse of trust as to each victim, we conclude that there is a reasonable probability that the jury would not have made the specific findings identified by the trial court differentiating Harmon's offenses as aggravating. "As *Sandoval* cautioned, 'to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court.' " (*Wandrey*, *supra*, 80 Cal.App.5th at p. 983.) That issue presents itself here. The inquiry into the extent to which Harmon secured for himself a position of trust as to each victim turns on an evaluation several relationships based on testimony from the victims. Even assuming that the trier of fact credited all of the witnesses' testimony, there may be room for reasonable disagreement as to whether, in light of the duration of the relationship, the intensity of the relationship, or the outward manifestations of trust, Harmon was in a strong position of trust as to each victim.[21] We are unable to find the error harmless under the state law standard. "Mindful of

---

imposed. As several of the additional factors identified in the court overlap with factors that were taken into consideration in other ways to extend Harmon's sentence, we pay close attention to the trial court's comments indicating the significance of Harmon's abuse of a position of trust in its sentencing analysis.

[21] The extent of Harmon's interactions with each victim varied. On one end of the spectrum, DiRubio testified that he and Harmon worked closely together and that he viewed Harmon as a best friend (but also that he was aware SAFE's advisory board, for example, was not what it appeared). On the other end of the spectrum, McGreevy described frequent interactions with Wallum but only limited interactions with Harmon, and it was Harmon's defrauding of McGreevy that was the basis for the aggravated principal term.

27

*Sandoval*'s caution, and in order to give Senate Bill No.567 its full effect, [we] remand for resentencing in light of the amendments to section 1170, subdivision (b)." (See *ibid*.)

### 2. *Remand*

Harmon requests that the matter be remanded for resentencing, but does not address how the matter should proceed on remand. The Attorney General contends that, if the matter is remanded, the District Attorney should be permitted to elect between proving to a jury the existence of aggravating circumstances in compliance with section 1170, subdivision (b)(2) or submitting to resentencing based on the current record. Acknowledging that the nature of the proceedings on remand proposed by the Attorney General are consistent with the proceedings directed in *Lopez*, we do not believe it is necessary to prescribe specific procedures to the trial court to govern resentencing. (Compare *Lopez*, *supra*, 78 Cal.App.5th at pp. 468-469; with *Zabelle*, *supra*, 80 Cal.App.5th at p. 1115; *Wandrey*, *supra*, 80 Cal.App.5th at pp. 983-984; *People v. Jones* (2022) 79 Cal.App.5th 37, 45-46.)

## III. DISPOSITION

The judgment is reversed and remanded for the sole purpose of resentencing under Penal Code section 1170 as amended by Senate Bill No. 567.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P.J.




_____
GROVER, J.




*People v. Harmon*
H047526